in his official capacity as President of the United States, et al. appellate. Mr. Lucas, for the appellate, Ms. Levy, for the affiliate. Good morning. Good morning, Your Honors. May it please the Court, Brinton Lucas of the United States, I'd like to reserve five minutes for rebuttal. In March of this year, Secretary Mattis, announced a new military policy that presumptively disqualified individuals with gender dysphoria, a mental health condition characterized by clinically significant distress or impairment in occupational functioning from military service, subject to various exceptions. That policy is entirely constitutional, as starkly illustrated by the fact that the same policy, the Carter policy, that the District Court ordered the military... You say this is a new policy, and that sort of gets to the heart of some of the argument here. What's the standard of review that we should be employing now? You see, you want us to get straight to the constitutionality of the Mattis plan, but isn't there an antecedent question we need to ask given the unique procedural posture here? I mean, we're here reviewing the denial of a motion to dissolve a preliminary injunction. That's a little unusual. So what's our standard of review for determining whether that denial of the motion for the dissolution of a preliminary injunction was properly made? Your Honor, it is the same as the entry of a preliminary injunction itself were here. Now, plaintiffs point to say that if not established... I don't think that's right. Aren't we here... Don't the federal rules tell us we're operating in the area of Rule 60b-5? That's... Although you haven't styled it that way, that's the provision of the Federal Rules of Subtle Procedure to tell us what to do when someone asks for relief or change from an order. So why aren't we examining this under 60b-5? Your Honor, we have the right to appeal, and plaintiffs do not dispute that we have the right to appeal a motion, a denial of a motion to dissolve a preliminary injunction, and their entire argument is that we have not established changed circumstances, and we believe that we have, Your Honor. I'd like to point you to two points. First, in terms of substance, we think that the new... Let me back up. Is the changed circumstance a question of fact or a question of law? Your Honor, in this case, we think that it is a question of law because the district... Why? Because the district court's view that this was not a changed circumstance rested on the interpretation of legal documents. Those documents included the President's Memorandum from 2017, as well as Secretary Mattis' proposed policy in 2018. And so, even if you characterize this as an abuse of discretion, we also think that that standard has been met here because we think that the new policy is clearly different from the old one. And I'd like to point you to two substantive differences across both retention, dealing with service members who are currently serving, and accession, dealing with applicants who wish to serve. So on retention, the new policy allows almost 10,000 individuals to continue serving in their preferred gender and to continue receiving treatment for gender transition at government expense. What was the number you put on that? Almost 1,000. So 900... So this is the grandfather clause? Reliance exception. So there are about 1,000 people you think in that? Excuse me, there are about 1,000... 937, as of this point, have qualified for that. They've received a diagnosis of gender dysphoria from a military medical provider under the terms of the Carter policy. So those individuals would not be allowed to serve under the district court's understanding of the 2017 memorandum. So that alone is a significant difference. In addition, current service members who have gender dysphoria or are transgender are not automatically disqualified. And this was the fear of the district court in her first opinion. She went through, and plaintiffs in the district court believed that all transgender individuals in the military were going to be subject to discharge starting on March 2018. They thought this was going to happen, and the only question the military was studying and resolving was how to discharge all transgender service members in the military. Now, I point you to the fact that, according to one survey, and this is at I believe page... page 275 of the Joint Appendix, the military estimates there are about 8,970 service members who identify as transgender. 937 of them have come forward and qualified for the reliance exemption, and the remaining ones are not going to be discharged on the basis of their transgender status. Again... But under the Mattis policy, they would have to identify with their biological sex to remain in the military, right? That is true, Your Honor, but that is also true under the Carter policy. Currently, they are serving and associated with their biological sex. If those individuals... Can you show me the language in the Carter policy that says that they are required to identify with their biological sex in order to remain in the military? Your Honor, I would point you to the Carter policy's framework for gender transition, and I think you can find that at pages 490 to 507 of the Joint Appendix, and that deals with, and is quite explicit, and plaintiffs do not diagnose... In order to obtain a gender transition under the Carter policy, you must receive a diagnosis of gender dysphoria from a military medical provider, and you must go through a process... It's a very formal process set forth at length, and only those individuals, upon completing that process, will be able to adhere to the standards associated with their preferred gender. So, Satan setting aside retention, the accession standards, Your Honor, are dramatically different from the accession standards established by the President's 2017 Memorandum. Specifically, and I'd quote... I'd point you to 287 of the Joint Appendix. This is in the military's report. The military says, Transgender persons should not be disqualified from service solely on account of their transgender status. That is consistent with the Carter policy. Of course, like the Carter policy, the Mattis policy draws distinctions on the basis of a medical treatment, gender transition, and a medical diagnosis, gender dysphoria. But it just subjects those to different exceptions. And that is very different from the policy adopted and maintained by the military before the change in 2016 adopted by then-Secretary Carter. Under that policy, and I'd point you to a report that plaintiffs rely upon. This is a report from a commission in 2014, chaired by Jocelyn Elders, and the report made clear that under the pre-2016 policy, even transgender individuals who don't want to take hormones or have surgery or undergo any aspect of gender transition were disqualified from military service. That's on 784 of the JA. Now, even setting aside the change in substance, I'd also point you to the fact that there's been a significant change. Let me go back to the change in substance. As I understand it, you argue that the Mattis plan newly allows transgender people who don't have gender dysphoria to serve, right? Yes, Your Honor. And that the old policy before Carter, that that policy didn't allow that. Is that right? Yes, Your Honor. Now, what is your basis for telling us that there was a categorical ban on transgender people before the Carter policy? I think it was widely established, and I would also just point you to the Elders report, which is heavily relied on, especially before the Mattis policy was announced, which made quite clear that at that time, it was a blanket disqualification for all transgender individuals, regardless of medical diagnoses or desire or need to transition. And that's on page 784 of the Joint Appendix. Okay, so isn't the effect of the Mattis plan, isn't the effect to work a total ban on transgender individuals? Because the Mattis plan requires that they act according to their biological sex. And isn't that a null set? Isn't that a contradiction right in itself? If one is a transgendered individual, the manifestation of that is acting according, is not acting according to biological sex. It's acting at variance with that. So haven't you created a null set, in effect? There's no one who can fit within the category that you've described. No, Your Honor. I'd like to give you at least several points in response to that concern. First, I would just point you to page 636 of the Joint Appendix. This is in the RAND report, and it discusses a survey that says 18 percent of transgender individuals surveyed said that they had no plans to ever fully undergo gender transition in their lifetimes. I'd also point you to the fact that under the military survey and the fact that it's identified... Are there transgendered people who can serve in their biological sex? Yes, Your Honor, and there are many who are doing so right now. So there's about 9,000 individuals in the military who identify as transgender, and only about 1,000 of those individuals have taken advantage of the Carter Policy's framework for gender transition. I'd also point you, again, back to the fact that 18 percent of transgender individuals surveyed planned to not transition during their lifetime, and that's from a survey discussed in the RAND report. I'd also point you to the elders report. Just so that we're all operating under the same understanding and definitions here, when you say the process for gender transition in the Carter, the Ash Carter Policy, what are you talking about? Not a medical, surgical transition? Certainly, Your Honor. So there are roughly three types of transition that the Carter Policy discusses. One is a surgical transition, another would be a hormonal transition, and the third would be social transition, but that's recognized as a formal medical treatment for gender dysphoria. It's a term of art, and for those individuals, according to one survey of at least the studies that have been done of the individuals who are currently undergoing transition or planning to do so, only about 8.5 percent of those individuals plan to undergo a social transition, but that's the framework. It's still a treatment, a medical treatment for gender dysphoria. But that's under-inclusive, isn't it? Because as I understand it, you're saying there are transgendered individuals in the military who can serve consistent with their biologic sex, but don't they have to suppress the very nature of their transgender condition to do that? Your Honor, those individuals who are currently serving may do so, and they may meet the standards. Now, in terms of whether they suppress or not, under the Carter policy, the only way they may transition, under the current policy in place, the only way they may transition is if they get a diagnosis of gender dysphoria from a military medical provider. And so the entire... You're talking about transition, but I'm suggesting to you that that's an under-inclusive way to look at this issue. That's one measure, but there are other measures, and the measure I'm talking about is a transgendered individual who has to suppress that characteristic to act consistent with their biologic sex. And isn't that... That's what the MADIS plan requires, and I'm asking you, doesn't that work as a ban on transgendered individuals? You can be a transgendered individual as long as you don't act like one, as long as you suppress your identity. Two points in response to that, Your Honor. First, I just think it's critical to underscore that under either the MADIS policy or the MADIS policy, the only way a transgendered individual may get an exemption from having to meet the standards associated with his or her biological sex is by a medical diagnosis of gender dysphoria. So that problem, in Your Honor's view, will persist across either policy. But second, I would analogize this... That seems inconsistent with your briefing. Your briefing said, I thought, that a transgendered person without a diagnosis of gender dysphoria could serve, but only if they identified with their biological sex. Yes, Your Honor. And that is true under both the Carter policy and the MADIS policy. But in response to my questions and Judge Griffith's questions about what did the Carter policy mean when it talked about this process for gender transition, and that's the language that you are pointing to to say that it's identical to the MADIS policy, you just said that the process for gender transition set forth in the Carter policy is treatment for gender dysphoria. You just said that. Yes, Your Honor. So if the person doesn't have gender dysphoria, then how does that part of the Carter policy that you just cited to apply to them? They would not be able to take advantage of that. If that person, under the Carter policy, does not have gender dysphoria, he or she would have to meet the standards associated with his or her biological sex. That's undisputed, Your Honor. Plaintiffs have not argued otherwise. Counsel, on this argument that to be a transgender person is to have a powerful desire to transition, it seems to me the data that Rand cites, page 636, note 2, indicates that's not the case. If one puts the numbers there together, there are a significant number of people who wish to transition, we don't know with what degree of passion, and then they're just starting with the assumption that 100% states the whole universe. There are 18% who apparently are not interested in transition. Yes, Your Honor, I think that powerfully underscores our point. And I would also point you to the Elder's Report, and this is on page 761 of the Joint Appendix. Also, take a look at pages 752 and 770, note 8 of the Elder's Report. And this is where it discusses that some transgender individuals are content in terms of treating their gender dysphoria through psychotherapy alone. And let me give you a concrete example of this. There are some transgender individuals who identify as nonbinary or gender fluid, and so the concept of gender transition has no meaning for these individuals. So, the universe of transgender individuals is much broader than plaintiffs have suggested. If you look at all the literature, Your Honor, the classic definition of anyone who is transgender is someone who simply identifies with a gender other than his or her biological sex. So, moving on, Your Honors, I think it's pretty clear that the new policy is both different in substance, but I think also in process. And I would point you to the fact that the new policy rests on an extensive deliberative process by the military, by a panel of experts who thoroughly study the issue, and the independent military judgment of the Secretary of Defense and these military experts. Now, is that a type of changed circumstance that weighs into 60b-5 analysis? I certainly think so, Your Honor. Why? Because the District Court's injunction, the order in 2017, was predicated on the assumption, and this was critical, and the District Court emphasized it, that this was based on the fact that, in the District Court's view, the President's memorandum did not rest on evidence or military judgment. That can no longer be the case here. The military has provided an over 40-page report that has exhaustively set forth all of its reasons for this policy. In addition, the military has come forth and repeatedly stated, and Secretary Mattis testified before the Senate why he thought this policy was a good measure, and in doing so, he emphasized, and this is also in the report at 274, I'd just like to underscore this, Your Honor, 71% of Americans of prime military age from 17 to 24 are disqualified under the military's accession standards. Those are incredibly rigorous accession standards. They range from conditions, from Carpal Tunnel Syndrome to food allergies to eczema to even using Invisalign as a treatment. But the issue here is whether one can make a restive distinction like that based on a suspect class, right? Based on a class of people who are determined to be a suspect class. So those distinctions you're making are different here. We're talking about a constitutional issue here, right? Your Honor, the policy, the Mattis policy and the other courts have looked at this and put this under the rubric of sex discrimination. Do you disagree with that? Your Honor, right here, I don't think any other court has confronted a policy that        Your Honor, right here, I don't think any other court has confronted a policy that and gender transition. Most of the other courts, when they've been addressing cases that at least the ones cited by plaintiffs have been addressing classifications on the basis of transgender status. And again, I would point you to 287 of the Joint Appendix that underscores that transgender status alone will not be disqualifying from military service, either with respect to retention or accession. Let me ask you about the Grandfather Clause. So you use that as an argument that there's been a change from the Presidential Memorandum to the Mattis Plan. Am I correct? That's one example of that something new has happened in the Mattis Plan. But doesn't the rationale that supports the Grandfather Clause, or doesn't the existence of the Grandfather Clause actually undercut the rationale for a ban in the first place? Here, these folks have been determined to be combat ready, to not undermine social cohesion. Your Honor, let me give you a few points in response to that. Just by way of analogies, the military currently has and is retaining, it's not over 36,000 service members with PTSD. But service members applicants with PTSD are not allowed to serve. They're not allowed to join the military on that front. The military has very different standards for retention versus accession. And the military addressed this specific issue about why the reliance exemption was necessary. I'd point you to 311 of the Joint Appendix, where it discusses that the investment in these service members that the military has made outweighs the risks with respect to this population. That's something the military does with respect to all sorts of conditions, ranging from high blood pressure to PTSD to sleep apnea to all sorts of serious issues. So what the military did here is by no means different. So we don't think that the reliance exemption undercuts this at all. If Your Honor has no further questions, I'll reserve the remainder of my time for rebuttal. Thank you. Thank you very much. May it please the Court, Jennifer Levi for the plaintiffs in this case. The March 2018 policy bans transgender people from the military. It bans only transgender people and all transgender people. The March 2018 policy requires anyone who serves to do so in their biological sex. Not living in a person's biological sex is the defining characteristic of what it means to be transgender. Your Honor, as the District Court noted, there are reasons why transgender people don't transition because of discrimination. And there's the requirement that someone suppress their identity is not an exception to a ban. So the definition of what it means, the defining characteristic, is to have an identity that's different from... Defining characteristic seems to be a kind of deceptive gloss imposed on an array of facts. And if the facts include that persons in a particular category, transgender, do not want apparently from the RAND report, it's quite independent of being in the military, do not want a transition, how can one say that the two categories are identical? Your Honor, the entire focus of the RAND report is on individuals who do transition. It looks at the medical utilization of individuals who transition. It compares foreign military policies that relate to authorizing people who transition to serve. The definition within the Carter policy for what constitutes a transgender service member is someone who undergoes transition. The beginning language of the RAND report that speaks to who transgender people are distinguishes, for example, people who defy gender stereotypes, tomboyish women, or feminine appearing men, who are not transgender, who don't transition. You make nonsense of the language of the RAND report, which presupposes that one can be transgender and not wish to transition, assuming you haven't already transited. Your Honor, the RAND report zeroes in on individuals who do transition. You may zero in on them, but they represent a subset of transgender individuals. So it appears from the RAND report. Your Honor, the 2018 policy addresses individuals who transition. The President's 2017 announcement prohibiting individuals from serving focused on individuals who transition. And the pre- Carter policy... Your Honor, what you say is very interesting, but it does not seem to respond to my question at all. Much of your argument depends on the equation between transgender and persons who either have made a transition or wish, presumably strongly, to do so. But that equation is not correct, according to the documents which actually underlie the Carter policy. No, Your Honor, what I'm saying is that the group of individuals, you can call them whatever you call them, but the group of individuals... No, I think we have to deal with the terms that we're, as lawyers, talking about, the terms that you've challenged and that the government defends. And maybe the government is wrong, but it seems to me that to the extent that you're relying on an equation between these two sets of labels, the record in the case is against you. Your Honor, the individuals that are referred to in the RAND report who suppress that very characteristic of identifying with a different sect do so because of discrimination and... Well, I don't know. That footnote, too, simply says do not wish to make a transition. That seems rather broad. I mean, I'm sure a lot of people do hesitate because of discrimination, et cetera, but that doesn't belie the proposition that there is a subset of transgender people who simply do not wish to make a transition. Your Honor, the 2018 policy is not a change in the announcement by the President that in the White House memorandum that excludes transgender individuals, it refers to prohibiting people from undergoing gender transition. It identifies or requested the government... Well, that in itself seems to recognize that they're separate categories. But the point is that the 2017 directive was focused on individuals, excluding individuals who undergo gender transition from serving. Well, it may have done that, but it also precluded persons who hadn't made a transition from serving. Your Honor, it reinstated... Or supported to. It directed the reinstatement of the pre-Carter policy, which discharged individuals for undergoing gender transition. The memorandum under which the final Mattis policy was adopted also instructed them to, the people to whom it was directed, to pursue other avenues. I recognize you have that first sentence, which does suggest you're just supposed to justify what's already been done, but there are other sentences which clearly invite a broader inquiry, which appears to have been made in any event. In the process? The process, as the district court found, followed through on the White House's directive to reinstitute a policy that excludes transgender people from the military. Yeah, but they're reviewing that decision and the question is whether in fact the Mattis policy is a carbon copy of the pre-Carter policy, and it seems to me self-evident that it isn't. There's nothing in the record that shows that the pre-Carter... The record shows that the pre-Carter policy subjected to discharge from the military individuals who had or would undergo gender transition, and prohibited people from enlistment who had completed gender transition. So the 2018 policy is a reinstitution of the pre-Carter policy. So you're saying that the pre-Carter policy focused exclusively on actual gender transition? Yes, Your Honor. The terms of the pre-Carter policy focused on exclusions for transsexualism and for change of sex. That is the defining characteristic that focuses on the fact that transgender individuals do not live in their biological sex. That was the revision, the update that the government was required to do, specifically set forth in the terms of reference that as to accessions, the government should revise the medical terminology, which is what it did to prohibit individuals who undergo gender transition, and it was to identify the specific medical services that people would be eligible for. So it was a pre-Carter exclusion that focused on transsexualism and change of sex in contemporary terms. Why isn't the Mattis Plan a significant change from the President's memo? Because before the Carter policy, I thought the policy was that if you're a transgender person, you cannot serve. Under the Mattis Plan, the Grandfather Clause permits service by some. Why isn't that a rather significant change? The standard for dissolving the preliminary injunction is that there's a change of circumstances that justifies the dissolution of the preliminary injunction. You'll admit, however, that is a change of circumstance. It may not be sufficient to dissolve the injunction, but you'll grant me, won't you, that that is, that's different. That is a portion of the Mattis Plan that is significantly different than the pre-Carter plan. Yes, Your Honor, but it doesn't remedy the constitutional injury here. And so it's not a change that has a significance that remediates the constitutional injury that those individual plaintiffs are experiencing because... So are there transgender people who can serve in the military in their biological sex? No, Your Honor. What it means to me... Why not? Explain that to me. Because it requires those individuals to act heterosexually. It would be the equivalent of a ban, for example, that required somebody who, we analogize it to a ban on gay individuals that would require them to act heterosexually. If you require someone to suppress the core characteristic... That certainly wasn't the Supreme Court's view in Goldman. In the Goldman case, it was an as-applied challenge to a facially neutral policy. Here, the policy on its face, in three separate ways, says that transgender individuals with gender dysphoria are excluded, transgender individuals without gender dysphoria are excluded. What about Rosker? That was not facially neutral. That's correct, Your Honor. Rosker wasn't. But here, the process doesn't reflect that there was a consideration of a chamber's policy. But don't Rosker and Goldman both caution the judiciary in the strongest possible terms that when we're in the military context, that we're dealing with the apogee of the political branch's powers to determine combat readiness, right? Isn't that what both those cases teach us, is to tell courts, tread very carefully if at all here, because we leave to the political branches the determination of who is combat ready and who is not combat ready. Why isn't that precisely what we're dealing with here? You are asking the courts to make determinations we are not equipped to make. Who is combat ready? Who is not? Your Honor, the weight of the evidence before the district court was that the 2017 White House memorandum was based on discrimination against a class of individuals. The government was directed to develop an implementation plan to carry out that discriminatory directive. The documents that the government has come forward with, including the terms of reference and the interim guidance, all reflect that the process indeed followed through with that directive to reinstitute a ban on transgender individuals serving and indeed the ultimate policy does that on its face. In contrast to that the government has argued that it has exercised independence in adopting this policy or that it has acted outside of the specific directive given to the president. In the middle is a black box of what actually happened during that process because the government has not come forward to support its unsupported assertion of the exercise of discretion or independence. And don't both Rosker and Goldman stand for the proposition that that is not an inquiry we ought to be engaged in. No, Your Honor. This is the military and it's the military context and it gets special deference. Not normal. I mean in Goldman they wouldn't even talk about the level of scrutiny. Right? Stay away from it. It's the military. They get great deference in matters like this. Your Honor, under Rosker the court said you apply the same standard of scrutiny that you would otherwise apply to a facially discriminatory policy. And here where the process where there's no evidence in the record that there was any independent discretion where another panel of this court already found that the initial 2017 directive from the president to reinstitute the ban was based on discrimination. There's simply at this point in time nothing in the record to to find that the district court acted outside of her discretion not to credit the unsupported assertions of the government and to find based simply based on the record in front of you. Do you know of any cases in the history of the Republic in which the judiciary has decided military-wide rules about accession and detention? Any case like that? Well, Your Honor. Has the judiciary ever done that before? In the case of Crawford v. Cushman where there was an exclusion for individuals who were pregnant where that medical condition was treated differently than other temporary conditions the court said that the only justification was based on amnesty because of sex and therefore the same level of deference wouldn't apply in that context. What we're arguing here is that the court has said that there simply is not sufficient evidence in the record at this point in time to apply the executive order.  that this is a case where the process had been focused on determining what the policy was. We have a policy here. This used to be the policy for years, right? Through numerous presidents had a ban similar to this one. The only time that hasn't been the case was in the last year of President Obama's administration. That's it. All the time that this has been an issue, presidents of different parties have had this policy. Then we have one change and now we have another president who wants to go back to the old policy. Why would the courts be involved in that decision? Because we're the only evidence in the record shows that the reason for the reversal of policy to reinstate a ban on transgender individuals. That's a bit strong. The only evidence? There's evidence? I mean, you heard your friend talk about the Mattis plan, convened a group of experts, they did studies, took time, they had the benefit of having some experience under the Carter plan? There's no evidence that supports that the process departed from the director from the president to reinstitute the ban. And the fact that there's not even an acknowledgment in the substance of the policy that it's a change of policy, even under the administrative law context. Help us understand how we're supposed to I mean, what in your view would indicate that there was an adequate reassessment? I mean, judges are asked to reconsider their decisions all the time. You know, party files a motion to reconsider. And the judge might issue an order that says I've considered all the arguments, but I believe that the original decision was correct, and I deny your motion. I mean, we don't employ some sort of presumption that they didn't really reconsider it, right? It would have had the requisite consideration that looked at the benefits of the policy, the effects of the reversal of policy, of the service level impacts of the reversal of policy. All that the report shows and all that the record has reflected is that the process was focused on implementing the president's directive to reinstate the ban, not that it was writing on a blank slate. And so what we are arguing is that based on the record here... The original memorandum itself invites the Secretary of Defense to advise to go in a different direction. So... Your Honor, on that same... And in fact, he did in one element with what I keep calling the grandfather clause. That was different than the original directive. Another panel of this court said that there was, based on the same White House, 2017 White House memorandum, that there was no anything other than to reinstate the pre-Carter ban on transgender individuals. And with regard to the grandfather clause that you referenced, it specifically included in the terms of reference document that the process should include consideration of currently serving transgender individuals. And it was for the purpose of reinstituting the ban and contemplated the continued service because once those individuals' terms of service expire, then the ban will have been complete. And it's also not a change for those individuals because it inflicts a constitutional injury that subjects them to different terms of service as individuals who are accepted from a categorical ban that deems them... In your view, what level of scrutiny should we use to analyze the Mattis plan? Your Honor, under any level of scrutiny, the Mattis plan fails because it's rooted in discrimination against a group of individuals. Counsel, before you go too far on that, can I read you the AMA's description of transgender dysphoria or consequences that it can cause debilitating distress, depression, impairment of function, self-mutilation, or other self-injurious behavior, and suicide. And I know that you in your brief scoffed at the numbers on suicide, but you said they were low, which they were if it happened, but the interesting question is the ratio between suicidal impulses in people with gender dysphoria and people without it. And there the ratio, I think, was about 8 to 1, which is the relevant comparison. You're clear that a military policy limiting people with these... with a condition that can exhibit these symptoms and has this very much higher ratio of suicidal impulses than the population at large. That's clearly wrong? If I may make two responses to that. One is that the policy on its face excludes transgender people, even without gender dysphoria. But to your point, the data that it refers to actually equates suicidal thinking with suicidal behavior. And if you look at the actual comparison, which is reflected by the data of comparison between suicidal thinking of non-transgender service members, they're about equivalent. And that's in the Surgeon's General Report and the amicus brief that's submitted by the Surgeon's General. The report that you refer to, the 8.5 number figure, actually wrongly compares suicidal behavior to suicidal thinking. And so that number is not consistent. In addition, there's nothing with... there's no reason to apply a special exclusionary rule in the military where the military already has significant vetting procedures for individuals with a suicidal history and can address any of those issues that arise during service for non-transgender individuals. As we know from the record, the military do preemptively exclude categories up to the point of 71% of the essentially eligible population, including limiting it to males of a particular age, so that... clearly to assure the availability of people who are able to serve without creating serious problems, the military normally uses exclusions which are broader than the actual incidence of problems. The military doesn't look at, for example, the increased levels of suicidality among children of service members, or among white individuals as compared to black individuals where there's higher levels of distress. There's no reason other than the direction to exclude transgender individuals for service for the military to have looked at this specific way of excluding transgender individuals, and it's the reason why it is so significant that the March 2018 policy excludes transgender individuals regardless of whether or not they have gender dysphoria. So if that were not part of the policy, if it were linked simply to dysphoria, different case? Well, Your Honor, gender dysphoria here is being used as a proxy for excluding transgender individuals. There has not been an evaluation in the process that looks separate and apart from the group that both gender dysphoria and gender transition is being used to focus on. Is there a group that's transgender and does not experience dysphoria? Yes, Your Honor, there are. There are transgender individuals who do not experience gender dysphoria and who do go through gender transition. So for those people who are transgender but who have not been diagnosed with gender dysphoria, how were they treated under the Carter policy? Under the Carter policy, anyone who was serving and would or did would undergo gender transition would be discharged. And anyone who underwent gender transition would be excluded from service. Under the Carter policy, as I said, focused as it was on transsexualism and change of sex. It excluded individuals who would or did undergo gender transition. So the person who was transgender without a diagnosis of gender dysphoria could serve only if they identified with their biological sex. Your Honor, there certainly have been people who have suppressed their identity as transgender individuals. But what it means to be transgender is to not identify in the birth sex. And so the fact that there have been transgender individuals who could suppress that core characteristic of their identity was not a policy that permitted transgender individuals to serve. I want you to answer my question as to what the Carter policy said with respect to those people. I'm sorry, Your Honor. Could you restate your question? The policy instituted in 2016 by Secretary Carter. If there was someone who wanted to join the military who said that they were transgender who had no diagnosis of gender dysphoria, what did the Carter policy say would be the accession rule for them? Your Honor, the reason I'm hesitating to respond is because it presumes that there are transgender individuals who have a gender identity that's inconsistent with their birth sex, who live and function consistent with their birth sex. In other words, who disavow their gender identity. Again, that distinction between conduct, that it's an effort to distinguish between the status of being transgender and the conduct that defines it, which is to not live in your birth sex. Under the Carter policy, in order for someone to enlist, they had to have completed, it authorized people to enlist who had completed gender transition and did so prior to 18 months before service. Okay, let me ask my question this way. Is there a difference between the Carter policy and the 2018 MADIS policy with respect to transgender persons who have no diagnosis of gender dysphoria? The Carter policy allows someone who is transgender to openly serve, and what the focus of that open service was was that it allowed somebody who had undergone transition and completed gender transition to enlist and allowed someone to remain in service who would undergo gender transition. And so that was the Carter policy. It's the precise opposite of the MADIS policy. And I'm talking about people without a diagnosis of gender dysphoria. If there was someone who had transitioned without a diagnosis, which there are, that person would be allowed to serve under the Carter policy and denied service under the March 2018 policy. And how do we know that? What language in the Carter policy tells us that? That individuals can. Your friend on the other side said a few minutes ago that you conceded that there was no difference between the Carter policy and the MADIS policy with respect to transgender persons with no history or diagnosis of gender dysphoria. Yes or no, do you concede that? The MADIS policy is completely the opposite of the Carter policy. Their argument that the Carter policy somehow allowed transgender people who didn't... misstates the criterion that authorizes people who transition to remain in service when they do so. It is a requirement that you complete transition while in service and change the Deere's marker before you can live consistent with your birth sex. So I asked you a yes or no question. Was that a no? Your Honor... Do you concede that the policies are the same with respect to a transgender person with no history or diagnosis of gender dysphoria? There's a chart at page 12 of the government's brief, opening brief. The first row in the chart. Is that chart correct or incorrect? Are you familiar with the chart I'm referring to? Yes, Your Honor. I am. The chart presumes that there are transgender individuals who live and function in their birth sex. It's a contradiction in terms, and it's a word game that the government is playing with this Court to suggest that there's an exception that allows transgender people to serve who are suppressing the core characteristic, the defining characteristic of what it means to be transgender. And that's impressive. Your Honor, on this question of what the pre-Carter policy was, the first paragraph of the Secretary Carter's July 28, 2015 memo says, effective July 2015, no service member shall be involuntarily separated, denied re-enlistment or continuation of service on the basis of their gender identity without various things and so forth. The overwhelming implication of that is that until that moment, the pre-Carter policy was automatic exclusion, indeed separation from the service for people who were simply transgender. Your Honor, there's, I mean, there's no evidence in the record that supports the government's argument that in pre-Carter, transgender, that there were transgender individuals. Well, I mean, it certainly makes this memo seem kind of crazy. What you say is true. Secretary Carter was sort of shooting it in the air. What Secretary Carter said is that individuals wouldn't be discharged for needing to undergo gender transition. No, what he says on the basis of their gender identity. That's what he says. Yes, and then the policy, the implementation of that policy was about revising the accession standards and revising the retention standards to ensure that people wouldn't be discharged if they had or would undergo. Yeah, I'm just talking about the opening line of his memo of July 28, 2015. But if your account of things is correct, it was crazily worded. It does not talk of transitions. It does not talk of any of those things. It talks about one thing, gender identity. And it seems to say no more will that be a freestanding basis for exclusion from the military, for separation from the military. Your Honor, again, it presumes that there are transgender individuals who live in their birth sex and do so for reasons other than suppressing the fact that they have a gender identity that's different than their birth sex. And in the pre-Carter policy, the individuals who were excluded or discharged from service were those who underwent gender transition, and those that were precluded from enlistment included those who underwent gender transition. You have a very binary view of the universe. And I take it under that anyone with an impulse towards transition out of his or her biological sex is A, transgender, and B, has part of that person's identity making such a transition. But there seem to be people who spend decades in their biological sex, and then after various things happen in their lives, they come to the view that they would like to transition, and then they do or do not transition. But they seem to  binary classification. It isn't exactly binary. It's an equation. But it's an equation based on a proposition that these binary phrases, transgender, significantly or passionately desiring a transition, are concepts that we can deal with, but we have to equate them. Your Honor, again, drawn in comparison to a ban on individuals on the basis of sexual orientation where somebody has a homosexual orientation, the fact that someone could either not act on that orientation or suppress that orientation doesn't make the individual not gay. And the fact that somebody could serve and repress or either act inconsistent with that identity and even later on go through the process of embracing it doesn't change the fact that that individual is gay. Except my hypothesis, I think it's clearly true, that there are people experiencing gradual processes, gradual transitions, mental transitions, psychological transitions in terms of awareness of even the possibility of changing sex. You seem to have that entire period of evolution zeroed out. They go automatically, apparently, and perhaps by your definitions, they have never had a period when it wasn't part of their identity to make a transition. I'd be astonished to find empirical evidence supporting that. The group that was targeted by the Mattis policy is the group... Please don't talk. You aren't responding. I'm talking about the real world, not about what policies target, etc. I mean, the fact that people decide to or are only able to later on transition doesn't change the fact that a policy that excludes... Please, please, please. Forget about policies. Forget about targets. Talk about the world. The world in which human people exist and have various notions of what they want of life and of themselves. Okay? Yes. If I may... If you mention policy in your answer to that, I will give up. Okay. If I may. During the pre-Carter world, there were also people who... I'm talking about the world. I don't care about the pre-Carter world, the Carter world, the Mattis world, any of those worlds. I'm talking about the world we live in. Okay? Where there are millions of individuals who go through various phases of psychological and other development. You appear to be telling me that anyone who at any point thinks that he or she wants to make a transition must, by definition, have always wanted that from the moment of serious consciousness. Do you argue with that? No, Your Honor. I'm not. But if I may... So is it the case that people may start out with one set of assumptions about themselves, go into a period when those assumptions, they begin to question those assumptions, and can go at least one or two ways, probably many more. One is to adopt the view that in fact their biological sex is something they're comfortable with, and the other is to adopt the view, at least at the opposite extreme, is to adopt the view that their biological sex is something they cannot be comfortable with, and therefore must make a transition. And this... is the whole phase of ordinary human beings' lives. If I may analogize to religion, there are individuals who may be of a particular faith tradition for part of their lives, and then may be Jewish for part of their lives, and then in a later time in their life may be of a different faith tradition. The fact that that happens doesn't change that they were of a particular faith tradition during a particular period of time. And so the problem here is... You're talking about it, invites the identification of a sort of intermediate category, agnostic either with respect to particular religion, or perhaps with respect to the deity altogether. The... what I'm suggesting, Your Honor, is the fact that someone might at a different period of their life either have a different identity or live in a different way. You make it sound like a switch gets flicked. Well, the flick that's being switched is the military's policy. Please put that aside. I guess, Your Honor, I am saying that there is a realness and a seriousness and a persistence to a person's gender identity. And that for transgender individuals that is defined by the fact that a person's identity is different than their birth sex. The fact that that may be true or different at a different period in their life doesn't change the fact that that defining characteristic is real and serious when it in fact emerges. And the record in this case, and it's supported by the affidavit by George Brown as well, is that gender identity is deep-seated and long-standing and set very early in life. And that Can it change throughout life? Transgender identity? Can it change throughout life? The record evidence is that it is typically impervious to change. It's deep-seated and it does not change throughout a person's life. I mean, there may be somebody whose identity is not as polarized as Deb Williams' question, but it's not that it changes over the course of a period's lifetime. It's false consciousness. Gender identity? The period of uncertainty between one's biological sex and a different gender is false consciousness. It's only when the person becomes assured that he or she wants to make the transition that his or her consciousness becomes truthful. Well, there's significant reasons why someone doesn't, is not able to embrace or understand their gender identity, particularly where it doesn't align with a person's birth sex, because both because there's such discrimination and because it is outside of what we anticipate that people's identities and birth sex is aligning. And so there are reasons why it does take longer for many people to understand that experience that is core to who they are. But it doesn't mean that that individual isn't transgender. Thank you very much. How much time does the government have? We'll give you back four minutes. Thank you, Your Honor. Four points. First, Judge Griffith, my friend on the other side conceded when you asked that there were changed circumstances. And so we think that based on that concession and her response was that, well, it still is not changed circumstances for the purpose of the constitutional analysis. That means we still have to go to the merits of the case. Secondly, Judge Williams, you've repeatedly asked my friend on the other side about the fact that transgender does not necessarily mean gender transition. She had no answer to that. We think that the record speaks for itself and makes clear that there is a significant subset of transgender individuals who do not transition their genders throughout their lifetime. Doesn't the AMA amicus brief refute that? Wasn't that simply the definition that your friend was using? No, Your Honor. I don't think so. The standard definition of transgender individual throughout the literature is someone who identifies with a gender other than his or her biological sex. That does not mean that that person will necessarily transition throughout his or her lifetime. But it does mean that for that category of individuals, if they are in the military and are required to act according to their biological sex, that the word we would use for that is suppression, right? They're suppressing an innate human characteristic of theirs. Is that right? I don't think so, Your Honor. Your argument is just that, well, they have to do that to serve. But there is suppression going on. Two points, Your Honor. I point you against the literature that first, not all transgender individuals seek to undergo transition. And that's not necessarily because of suppression. Sometimes their gender identities do not line up to either male or female gender identities. And so they are comfortable serving in their particular biological sex. And secondly, even if you think that there's some sort of suppression, Your Honor, we would analogize this case to Goldman. And we don't think it is any different than the Air Force regulation that required all service members not to wear headgear while indoors. That required Captain Goldman certainly, it recluded him from service consistent with his faith. But plaintiffs... What do you do about your friend's argument that that was a facially neutral regulation and that this is not, that this is facially discriminatory? Your Honor, we think they're both facially neutral. In either case, all service members, save for ones whether they're fallen under reliance exemption or in the Carter policy, are required to meet the standards associated with their biological sex. That applies regardless of the gender identity of the service member. That is just as facially as neutral as the Air Force's regulation saying that no service member could wear headgear indoors. To be sure, for many transgender individuals, that will be preclusive for service. But that does not mean it is not facially neutral. Neither plaintiffs nor the courts, nor anyone has suggested that the regulation in Goldman was not facially neutral. Even though, to be sure, it had a significant impact on service members of a particular faith, like Captain Goldman. We see no difference here. And we don't think there should be a distinction between religious identity and gender identity in the context of military deference. And I think going on and responding, particularly Judge Wilkins, you were concerned and you repeatedly asked my friend on the other side whether there were any, whether there was a difference in the Carter policy and the Mattis policy between how they treated transgender individuals without gender dysphoria. I don't think she ever gave you an answer and that is because they are treated the same. You can look throughout the record and I would point you, for example, to page 461 of the Joint Appendix stating that under the Carter policy, you must receive a diagnosis of gender dysphoria in order to begin the transition process. Finally, Judge Griffith, I would just return to your point that this is truly extraordinary what has happened here. The military is subject to four nationwide injunctions precluding it from adopting a policy that the Secretary of Defense, in his professional military judgment, has concluded poses would better further the national defense and avoid a policy that poses risks to the United States military. We are asking for just a simple amount of deference that was applied in Goldman, that was applied in Rosker. The way we got here is an extraordinary circumstance, too. The way this policy was first created and announced. That's one of the issues you have to deal with, whether there was a taint that was created in the first instance that the Mattis plan has been freed from. But that's extraordinary as well. Your Honor, we don't think this is any different from, say, the travel ban case in Trump v. Hawaii. In that case, the argument proposed by the plaintiffs there was incredibly similar to the one advanced by the plaintiffs here. They said that the final version of the proclamation was simply the, it was tainted by the President's tweets, it was the product of the previous executive orders, and thus the process underlying it. The government was able to show the Supreme Court there that there were many, many differences from the ultimate ban than there were from the first one. You haven't been able to identify so many. You've identified some. One in particular, what I keep calling the grandfather clause. Your Honor, the many, many differences in the travel ban litigation, there weren't that many significant ones between the first executive order and the second executive order and the final proclamation. In fact, plaintiffs before the Supreme Court in the Hawaii litigation repeatedly told the Supreme Court this is substantially the same travel ban. Sure, it mixed around various countries and so on and so forth, but the core of it remained the same. And that was their argument for why it could not be actually neutral, notwithstanding the process of review that underlay that proclamation. The same thing is true here. Instead of arguing that there is religious gerrymandering, plaintiffs have advanced the notion that this is somehow a form of transgender gerrymandering. But the Mattis policy is based on a thorough investigation and study of this issue, and it draws distinctions on the basis of gender dysphoria and gender transition, the same distinctions the Carter policy adopted. Just so that we're clear, what changed between the original 2017 plan and the 2018 plan other than the grandfather provision? Certainly, Your Honor. The critical difference setting aside the grandfather provision is the fact that under the 2017 presidential memorandum and the free Carter policy, individuals, transgender individuals could be discharged solely on the basis of their gender identity, even if they expressed no desire to transition, even if they had no gender dysphoria, those individuals could not come in and could not serve. They would be under fear of discharge. That is no longer the case, and the Mattis policy is expressed on this point. I point you again to page 287 of the JA, where it says transgender individuals shall not be disqualified on the basis of their transgender identity. Respond to your friend's argument that there's a noble set of that, that to be a transgender individual means that you cannot live according to your biological sex, or to do so you do it at great human cost of human suffering. Again, Your Honor, I would point you to all the various sources in the literature cited on pages two to three of our reply. I'd point you specifically to this study cited in the Rand report saying that 18 percent of transgender individuals just do not plan to ever transition. I'd point you to the study chaired by Jocelyn Elders that discusses that for many transgender individuals, gender transition has no framework and no meaning. It's not a noble set, Your Honor, and plaintiffs are just simply resisting this argument and this fact in the literature in order to advance their case. Thank you. The case is submitted.
judges: Griffith, Wilkins, Williams